## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**JIMMIE SPRATT**                                              **CIVIL ACTION**

**VERSUS**                                                    **NO. 19-9115**

**DARREL VANNOY, WARDEN**                            **SECTION "F"(4)**

## SUPPLEMENTAL REPORT AND RECOMMENDATION

On June 16, 2020, the undersigned Chief Magistrate Judge issued a Report and Recommendation (ECF No. 27) recommending dismissal of the remaining exhausted claims in Jimmie Spratt's 28 U.S.C. § 2254 petition for writ of habeas corpus as amended (ECF Nos. 1, 24) on January 31, 2020.[1]  Spratt through counsel filed timely objections to the Report and Recommendation.[2]  On April 1, 2021, the District Judge remanded the matter with the following instructions:

> IT IS ORDERED: that the matter is remanded to Magistrate Judge Roby to assess, in a supplemental Report and Recommendation, the merits of the plaintiff's June 25, 2020 objection. In addition to any other analysis she deems pertinent, the magistrate shall (1) consider whether the petitioner's case is materially distinguishable from <u>Dickerson v. Guste</u>, as the petitioner contends at page 6 of his objection, and (2) assess the extent to which the petitioner's case is analogous to <u>Dickey v. Florida</u>, as well as the legal effect of any such similarity.  <u>See</u> Obj. at 6-8.

ECF No. 29.

The Court's June 16, 2020, Report and Recommendation (ECF No. 27) is included and adopted as if repeated in full herein and supplemented with the following discussion, findings, and conclusions.  For the reasons that follow, and those previously assigned, Spratt's objections should be overruled and his petition dismissed with prejudice.

---

[1] ECF Nos. 24, 27.

[2] ECF No. 28.

## I.    Spratt's Speedy Trial Claim is Procedurally Barred

### A.    Introduction

Applying the deferential standards of the AEDPA and appropriate federal law, the Court's June Report and Recommendation (ECF No. 27) recommended that Spratt's free-standing speedy trial claim be dismissed as procedurally barred from federal habeas review because it had been found procedurally defaulted in the state courts' post-conviction review.  The Court also assessed whether Spratt proved an excuse to the procedural bar through the recognized doctrines of cause and prejudice and fundamental miscarriage of justice.  The Court concluded that Spratt failed to prove cause for his procedural default (leaving no reason to discuss the prejudice factor) or that a fundamental miscarriage of justice would occur if the claim was not addressed on the merits.

Specific to cause, Spratt asserted that his trial counsel's ineffective assistance caused the default when he failed to file a motion to quash the indictment based on violation of his speedy trial rights.  The argument was arguably asserted as a separate claim[3] under *Strickland v. Washington*, 466 U.S. 668 (1984), and review of the claim was exhausted through the state courts as required under *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).  To avoid repetition of the necessary *Strickland* standards, the Court included the cause for default discussion in its review of Spratt's other ineffective assistance of counsel claims.[4]

---

[3] *See* ECF No. 1-1, at 35 ("Petitioner's trial attorney doubled as his appellate attorney and was equally ineffective wearing either hat, failing to assign errors for the Court's improper jury instructions, the admission of hearsay DNA evidence or violations of Petitioner's speedy trial rights."); ECF No. 24, at 23 ("Moreover, Petitioner's 'cause and prejudice' for his failure to raise this claim was his counsel's ineffectiveness at both the trial and appellate levels, a claim Petitioner raised in his *pro se* Application and which he has maintained repeatedly since, exhausting at every level of state review.")

[4] ECF No. 27, at 14-15, 22-37.

Spratt's arguments were specifically focused on trial counsel's failure to object to the pre-indictment delay between placement of a detainer in 2005 and the 2010 arrest and indictment. He occasionally noted that his trial counsel also was his appellate counsel, and at that stage, also failed to challenge the alleged speedy trial violation. In both the state courts and his federal petition, Spratt also asserted these arguments as a separate ineffective assistance of counsel claim which had been denied as meritless by the state courts under *Strickland*. The effective assistance of counsel, whether at trial or on appeal, is adjudged under the *Strickland* standard.[5]

In the June Report and Recommendation, the undersigned thoroughly discussed and resolved under the doubly deferential AEDPA review, that Spratt had not shown that the state courts' ruling under *Strickland* was contrary to or an unreasonable application of Supreme Court law. To accomplish this task, the Court engaged in a complete review of the record to determine whether Spratt's counsel's failure to file the motion to quash was unreasonable under *Strickland*'s deficient performance prong. This complete review included the historical progress of Spratt's case from the occurrences of the rapes in New Orleans, his conviction for other rapes in Memphis, the discovery of his matching DNA, placement of the detainers, and his eventual arrest, indictment, prosecution, and conviction for the multiple rapes in New Orleans. The assessment of this timeline of events was critical in evaluating the reasonableness of his counsel's performance under professional norms as required under the deferential *Strickland* standards.

It is disingenuous and a misstatement of the record for Spratt to suggest that this Court limited its review to the post-arrest delays to the exclusion of the pre-indictment delays when

---

[5] *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Dorsey v. Stephens*, 720 F.3d 309, 319 (5th Cir. 2013). When alleging ineffective assistance of appellate counsel, the defendant "must show that the neglected claim would have had a reasonable probability of success on appeal." *Duhmel v. Collins*, 955 F.2d 962, 967 (5th Cir. 1992).

confirming the state courts' resolve that Spratt's counsel was not ineffective under *Strickland*.  To the contrary, the Court thoroughly discussed the pre-indictment events and alleged delay.

Spratt, however, takes exception to the Court's application of relevant and critical Supreme Court and other federal law to confirm that the pre-indictment, post-detainer delay, in the words of the Supreme Court, were "***wholly irrelevant***" to assessment of his speedy trial rights.  *United States v. Lovasco*, 431 U.S. 783, 788-89 (1977) (citing *United States v. Marion*, 404 U.S. 307, 320 (1971)).  As a result, the state courts' denial of relief was not contrary to or an unreasonable application of *Strickland*.  Having reached that conclusion, the Court also found that, because Spratt had not shown deficient performance by his counsel under *Strickland*, he also had not established cause for the procedural default of his free-standing and procedurally defaulted speedy trial claim.

To be clear, this Court *did not* and *could not* address the merits of Spratt's defaulted speedy trial claim in the June Report and Recommendation.  Spratt cannot use his objections to the Court's evaluation of his *Strickland* claim (and cause for default arguments) as an end-around attempt to have the District Court now consider the merits of his defaulted speedy trial claim.  The evaluation of his speedy trial arguments is limited here to the Court's determination and evaluation of his counsel's performance under *Strickland* and whether it constituted cause for the default.

In summary, to prove cause based on his counsel's assistance, Spratt had to demonstrate that his counsel provided ineffective assistance when he failed to file a motion to quash (or assert the claim on direct appeal).  In addressing that argument, the state courts found that Sprat's counsel was not ineffective under *Strickland*.  This federal habeas court had to determine whether that ruling was contrary to or an unreasonable application of *Strickland*.  For the following reasons and

those previously assigned in the June Report and Recommendation, Spratt has not met that burden

under *Strickland* or the AEDPA and has not established cause to excuse the default.

**B.**   **Spratt Has not Shown Counsel was Ineffective as Cause for His Defaulted Speedy Trial Claim or As a Separate Claim under *Strickland***

To accomplish a full consideration of cause for the default, and any separate ineffective

assistance claim, this federal habeas court is bound by the doubly deferential standards AEDPA to

consider whether the state courts' denial of relief on Spratt's *Strickland* claim was contrary to or

an unreasonable application of the two-prong test in *Strickland*.  Under *Strickland*, it would not be

enough for Spratt to show deficient performance, *i.e.* that counsel should have filed the motion; he

would also have to show prejudice to the outcome of the proceeding, *i.e.* that but for counsel's

deficient performance the outcome of the trial would have been different.  *See Strickland*, 466 U.S.

at 689.

The Supreme Court has held that, under *Strickland*'s first prong, "[t]he question is whether

an attorney's representation amounted to incompetence under prevailing professional norms, not

whether it deviated from best practices or most common custom."  *Harrington v. Richter*, 562 U.S.

86, 105 (2011).  As for prejudice under *Strickland*, "[t]he petitioner must 'affirmatively prove,'

and not just allege, prejudice."  *Day v. Quarterman*, 566 F.3d 527, 536 (5th Cir. 2009) (quoting

*Strickland*, 466 U.S. at 695).  This is the critical consideration under *Strickland's* "but for"

prejudice test; this standard requires a "substantial," not just "conceivable," likelihood of a

different result.  *Harrington*, 562 U.S. at 112.

The Louisiana Supreme Court did not provide (and need not have provided) a detailed

statement of its reasons under *Strickland*, or whether it relied on the deficiency or prejudice prong.

Therefore, in the June Report, this Court first reviewed the record to consider whether it was

reasonable performance for Spratt's counsel to have proceeded without filing a motion to quash and the substantial likelihood of prejudice to the outcome of the proceedings as a result to determine under the doubly deferential AEDPA standard whether the denial of relief was contrary to or an unreasonable application of *Strickland*. Under that standard, the court gives deference to the reasonableness of the counsel's actions and the reasonableness of the state court's denial of relief under *Strickland*. *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011); *Harrington*, 562 U.S. at 105. This Court reviewed and considered both state and federal law to evaluate counsel's performance.

Turning to the deficiency prong first, the Court considered Spratt's claim that there was a pre-indictment delay violative of his Sixth Amendment federal rights to speedy trial that should have compelled his trial counsel to file the motion to quash. In doing so, the Court's research resolved that there are no cases on the proverbial "all-fours" as Spratt suggests. The Court then relied on analogous cases from both the Supreme Court and lower federal courts to shed light on whether Spratt's trial counsel acted unreasonably, or prejudicially, in the failure to file a motion to quash based on Spratt's proffered speedy trial grounds. He did not.

As instructed, the Court provides the following discussion of *Dickerson* and *Dickey* based on Spratt's objections.

### 1.    Distinguishing *Dickerson v. Guste*, 932 F.2d 1142 (5th Cir. 1991)

In his objections, Spratt agrees with the Court that the Supreme Court in its own words made clear for purposes of the Speedy Trial Clause that "lengthy pre-indictment delay . . . is ***wholly irrelevant***," unless there has been "'a formal indictment or information or else the ***actual restraints*** imposed by ***arrest and holding to answer*** a criminal charge . . ..'" *Lovasco*, 431 U.S. 788-89 (citing

*Marion*, 404 U.S. at 320).  Spratt also apparently agrees, as the Court also discussed in the June Report, that there must be "actual restraints" as defined by the federal courts for the speedy trial rights to engage.[6]  Spratt's objections seek to impose, without legal support, his own definition of what constitutes "actual restraints."  Spratt contends that his indictment acted as this type of actual restraint, despite the clear statements of the Supreme Court and Fifth Circuit.

Specifically, Spratt takes exception to any reliance on *Dickerson*, 932 F.2d at 1142, because it is not as factually similar to his case as *Dickey v. Florida*, 398 U.S. 30 (1970).  At the outset, this Court never posited that *Dickerson* was factually similar to Spratt's case.  The Court cited *Dickerson* for its legal conclusion that a *detainer* does not amount to the "actual restraints" required by Supreme Court precedent, including *Lovasco* and *Marion*, for purposes of the Speedy Trial Clause.[7]  *See Dickerson*, 932 F.2d at 1144.  The *Dickerson* court, citing the Supreme Court, held that the detainer "merely puts the officials of the institution in which the prisoner is incarcerated on notice that the prisoner is wanted in another jurisdiction" for prosecution on other crimes.  *Id.* (quoting *United States v. Mauro*, 436 U.S. 340, 358 (1978)).

Spratt, nevertheless, contends in his objections that *Dickerson* "is materially distinguishable to the instant matter"[8] for the following reasons:

(1)    In *Dickerson*, "the State of Louisiana attempted to exercise custody over Dickerson, but federal prison authorities refused to release Dickerson until his federal sentence was completed," which showed that the Louisiana officials "did not intentionally delay the indictment to gain a tactical advantage[, and] . . . [t]he federal incarceration impeded the state from bringing Dickerson to trial."[9]  And, in Spratt's case, "the State made no

---

[6] *See* ECF No. 27, at 26 (Report and Recommendation); ECF No. 28, at 6.

[7] ECF No. 28, at 5.

[8] ECF No. 28, at 6.

[9] ECF No. 28, at 6 (quoting *Dickerson*, 932 F.2d at 1144).

efforts to locate, extradite, or transfer Petitioner to face charges and where, in fact, it was Petitioner who made repeated attempt to determine the nature and source of the state detainer lodged against him."[10]

(2)     In *Dickerson*, the defendant could establish no prejudice for the three-year delay in the commencement of his prosecution. Spratt, on the other hand, claims that during the intervening five years between placement of the detainer and his indictment, two alibi witnesses and an alternative suspect were lost.

(3)     "Petitioner's incarceration did not make him unavailable for prosecution as there have long been in place straightforward procedures for the transport of defendants and prison inmates from one jurisdiction to another."[11]

(4)     "[U]nlike the petitioner in *Dickerson*, Petitioner here made repeated attempts to locate the source of his retainer (sic) and initiate the proceedings against him."[12]

The Court has been instructed to consider whether Spratt's case is materially distinct from *Dickerson* based on these suggested points. While all cases have some factual differences, the differences between Spratt's case and *Dickerson* are not material to resolution of Spratt's *Strickland* claim/showing of cause or the application of *Dickerson*'s holdings to determine whether Spratt has stated a *Strickland* claim or cause for his default.

a.     **Background of the *Dickerson* Case**

In 1991, Johnny Dickerson was before the United States Fifth Circuit Court of Appeals on appeal from the denial of his pretrial federal habeas petition brought in the Eastern District of Louisiana.[13] *Dickerson*, 932 F.2d at 1142. The *Dickerson* court referenced the "remarkable saga of Dickerson's labyrinthian journey through a wide assortment of state and federal courts and

---

[10] *Id.*

[11] *Id.* at 7 (with no citing authority for this conclusion).

[12] *Id.*

[13] *See* Civ. Action 89-1357"K"(1) (E.D. La.), Rec. Doc. Nos. 18, 19.

8

prisons." *Dickerson*, 932 F.2d at 1143.  The court noted that the crimes underlying his petition were a murder, kidnapping, and armed robbery that occurred in April of 1981 in Tangipahoa Parish, Louisiana.  *Id*. (citing *Dickerson v. Louisiana*, 816 F.2d 220 (5th Cir. 1987)).  In February of 1983, a Louisiana state court judge signed two arrest warrants for Dickerson in connection with the 1981 crimes.  When the warrants were issued, Dickerson was already a convicted inmate serving a sentence in a federal prison on unrelated charges for which he was convicted in the United States District Court for the Eastern District of Louisiana.[14]  *Id*.  Federal officials would not accept the arrest warrants and required that the Tangipahoa officials file a detainer.  *Id*.  Within two weeks after issuance of the arrest warrants,[15] Tangipahoa Parish Sheriff's Office officials lodged a detainer against Dickerson, and officials at the federal prison accepted and placed the detainer against him.  *Id*.

Dickerson almost immediately began extensive efforts to gain information about the detainers and any Louisiana charges and efforts to secure a speedy trial.[16]  Dickerson filed "repeated motions for speedy trial" in the Louisiana state court.  *Dickerson*, 932 F.2d at 1143.  In 1985, Dickerson also filed a pretrial habeas petition in the Eastern District of Louisiana, and the petition was denied.[17]  *Id*.  Dickerson appealed that ruling.  *Id*.

---

[14] Cr. 82-221"D" (E.D. La.).

[15] In the Fifth Circuit's decision on Dickerson's prior habeas proceeding, the Court explained: "After these warrants were issued, the Tangipahoa Parish Sheriff's Office wanted to extradite Dickerson from the federal prison in Harrisburg, Pennsylvania, where Dickerson was being held.  However, federal officials told the sheriff's office that they would not release Dickerson while he was in federal custody. The sheriff's office was told by federal officials that the only thing the sheriff's office could do was issue a detainer."  *Dickerson*, 816 F.2d at 221-22.

[16] In its earlier opinion, the Fifth Circuit detailed Dickerson's extensive efforts to get a speedy trial while he was in federal custody.  The full text will be presented later in this Supplemental Report.  *Dickerson*, 816 F.2d at 222-23 (emphasis added, footnotes omitted).

[17] *See* Civ. Action 85-2620"K"(1) (E.D. La.), Rec. Doc. Nos. 5, 6.

In September of 1986, while his appeal was pending, Dickerson finished serving his federal sentence. *Id*.; *see also Dickerson*, 816 F.2d at 223-24. On completion of the federal sentence, "[t]he Louisiana detainer was activated, and Louisiana officials arrested him." *Dickerson*, 932 F.2d at 1143. Two months later, in November of 1986, Dickerson was indicted by a Tangipahoa Parish grand jury for the 1981 first-degree murder, aggravated kidnapping, and armed robbery. *Id*. (citing *Dickerson*, 816 F.2d at 221-24). On May 13, 1987, the Fifth Circuit affirmed the denial of Dickerson's 1985 federal habeas petition finding that "Dickerson had not exhausted state remedies because he had not filed a motion for speedy trial in state court since the date of his indictment." *Id*. (citing *Dickerson*, 816 F.2d at 228-29).

After this, Dickerson filed a motion in state court to quash the indictment alleging a violation of his right to a speedy trial, and it was denied by the state court. *Dickerson*, 932 F.2d at 1143. Dickerson was later convicted by a jury for second degree murder, aggravated kidnapping, and armed robbery. He was sentenced to serve two consecutive life sentences and a fifty year sentence without benefit of parole, probation, or suspension of sentence. *Id*. Dickerson asserted denial of the right to speedy trial on direct appeal. The Louisiana appellate court affirmed his convictions and sentences, and the Louisiana Supreme Court denied his related application for writ of review. *Id*. (citing *State v. Dickerson*, 529 So.2d 434 (La. App. 1st Cir.), *writ denied*, 533 So.2d 353 (La. 1988)).

Dickerson thereafter filed his 1989 federal habeas petition which included *inter alia* his claim that the state violated his due process and Sixth Amendment speedy trial rights. *Dickerson*, 932 F.2d at 1143. The Fifth Circuit affirmed the denial of his habeas petition with the following reasoning:

Dickerson contends that the three and one-half years he spent in federal prison under a state detainer order should be considered as time spent in the custody of the state. This extreme delay, he argues, clearly violated his right to a speedy trial. He also asserts that state officials failed to make a good faith effort to extradite him from federal custody.

The United States Supreme Court has provided us clear guidance on the significance of a lengthy preindictment delay. *See United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). Concerns over the speedy trial clause of the sixth amendment arise only after the defendant has been formally indicted or actually restrained accompanying arrest. *Marion*, 404 U.S. at 320, 92 S.Ct. at 463. Although Dickerson was aware of the state detainer against him stemming from the investigation of a murder, he was not actually in state custody until after his release from federal custody.

[. . .]

The state detainer was not the basis for Dickerson's federal incarceration. "[A] detainer merely puts the officials of the institution in which the prisoner is incarcerated on notice that the prisoner is wanted in another jurisdiction for trial upon his release from prison." *United States v. Mauro*, 436 U.S. 340, 358, 98 S.Ct. 1834, 1846, 56 L.Ed.2d 329 (1978). Speedy trial considerations do not arise until a defendant is formally charged with a crime or actually restrained in connection with that crime. *See Marion*, 404 U.S. at 320-21, 92 S.Ct. at 463-64.

This Court has explained the interplay between a defendant's sixth amendment right to speedy trial and a defendant's rights to due process in this area:

> There is no sixth amendment right to a timely indictment. Protection from delay in indictment must be found in the due process clause of the fifth amendment. That protection is limited. The passage of a long period of time between knowledge by the prosecution of indictable conduct and an indictment is not enough, even if the delay was harmful to a defendant. Rather, defendants must show that the government intentionally delayed the indictment to gain a tactical advantage, and that the delay caused them actual and substantial prejudice.

*United States v. Carlock*, 806 F.2d 535, 549 (5th Cir. 1986) (citations omitted), *cert. denied*, 480 U.S. 949, 107 S.Ct. 1611, 94 L.Ed.2d 796 (1987).

The State of Louisiana attempted to exercise custody over Dickerson, but federal prison authorities refused to release Dickerson until his federal sentence was completed. The record shows that the state did not intentionally delay the indictment to gain a tactical advantage. Instead, the federal incarceration impeded

the state from bringing Dickerson to trial.  Since Dickerson has shown neither intentional delay by the state nor actual and substantial prejudice to him caused by the delay, he has failed to show a violation of due process.  See *id*. at 549.

*Dickerson*, 932 F.2d at 1144-45.

### b.    No Material Distinction but Many Similarities

A review of the complete factual background of *Dickerson* reveals very little distinction and instead discloses more similarities to Spratt's case.  An initial similarity is that both *Dickerson* and Spratt's current petition involve federal habeas review, not a direct appeal writ like that in *Dickey*.  There are a few distinctions between the plight of Dickerson and Spratt.  For example, Dickerson was a convicted federal prisoner when the Louisiana detainer was placed against him, while Spratt was a convicted Tennessee state prisoner when the detainer was placed against him.  Dickerson's counsel filed a pretrial motion to quash the indictment on speedy trial grounds, which obviously was not done in Spratt's case.  The matters also was asserted on direct appeal, unlike in Spratt's case.

Dickerson also had a shorter pre-indictment delay than Spratt.  Dickerson's was arrested and indicted in Tangipahoa Parish in 1986 following completion of his federal sentence, which was more than three years after his detainer was filed with federal authorities.  Spratt was arrested and indicted in 2010 after he completed his Tennessee sentences, which was more than five years after the detainer was placed with Tennessee authorities in 2005.

Nevertheless, any distinctions are not significant or material to resolution of Spratt's ineffective assistance of counsel claim or assessment of cause for his defaulted speedy trial claim.  As instructed, the Court will address each of Spratt's proposed distinctions and expose the fallacy of his arguments.

12

### i.    <u>Assertions 1 and 3:  Efforts to Transfer Custody</u>

Spratt asserts that, in *Dickerson*, Louisiana officials did not intentionally postpone taking Dickerson into custody because "the State of Louisiana attempted to exercise custody over Dickerson, but federal prison authorities refused to release Dickerson until his federal sentence was completed."[18]  In contrast, he claims that in Spratt's case, "the State made no efforts to locate, extradite, or transfer Petitioner to face charges and where, in fact, it was Petitioner who made repeated attempt to determine the nature and source of the state detainer lodged against him."[19] He also contends that his incarceration in Tennessee did not make him unavailable for prosecution because of "straightforward procedures for the transport of defendants and prison inmates from one jurisdiction to another."[20]

An appreciation of the complete events in *Dickerson* helps explain that the federal official's alleged "refusal" was actually the federal official's requirement of more than just arrest warrants to act as a hold on Dickerson.  The federal officials required that the Tangipahoa officials present a detainer and await his release to take custody because Louisiana was not a member of the Interstate Agreement on Detainers Act.  *Dickerson*, 816 F.2d at 222 & n.4.  Contrary to Spratt's comments, there was no repeated or special effort by Louisiana or Tangipahoa officials to obtain Dickerson's presence at trial.[21]  The officials simply placed the detainer to assure that at some point they could execute the arrest warrants, just like in Spratt's case.

---

[18] ECF No. 28, at 6 (quoting *Dickerson*, 932 F.2d at 1144).

[19] *Id*.

[20] *Id*. at 7 (with no citing authority for this conclusion).

[21] Two years later, a deputy sheriff wrote a letter advising federal officials that they still intended to arrest Dickerson. The court did not make clear whether the letter served to validate the pending detainer or some other purpose.

In Spratt's case, the Orleans Parish officials were also unable to just show up and take Spratt into custody. Contrary to Spratt's claims, the Louisiana officials did in fact make an effort to locate him, and they found him through his matching DNA in a Tennessee prison eleven years after the rapes. This effort to locate him is how the officials were able to place the detainer with Tennessee officials. Similar to *Dickerson*, with arrest warrants issued, Louisiana officials had to place the detainer with the Tennessee prison officials to secure his presence upon completion of his sentences. This occurred in January 2005, shortly after his DNA proved a match with the three rape kits. Also similar to *Dickerson*'s delay, Spratt's detainers were placed five years before his actual arrest and ultimate indictment after he completed the Tennessee sentences.

Spratt provides no support for his contention that the Louisiana officials could have simply had him transported to Louisiana by means of "straightforward procedures for the transport of defendants and prison inmates from one jurisdiction to another."[22] He describes no such procedure in his objections or his other pleadings. Furthermore, even in *Dickerson*, the courts recognized that Louisiana was *not* a member of the Interstate Agreement on Detainers Act ("IADA"), the recognized and enforceable procedure amongst varied jurisdictions.[23] Louisiana has never adopted the IADA.[24] With no "straightforward procedures" identified, his conclusory contention

---

[22] ECF No. 28, at 7.

[23] *Dickerson*, 816 F.2d at 222 & n.4 (citing 18 U.S.C. App.) ("The Detainers Act prescribes procedures by which a member state may obtain for trial a prisoner incarcerated in another member jurisdiction and by which a prisoner may demand the speedy disposition of certain charges pending against him in another jurisdiction. *See generally Mauro*, 436 U.S. at 349-55, 98 S.Ct. at 1841-45. Under Article III of the Detainers Act, a state becomes a member when it enacts the provisions of the Detainers Act into law. The federal government is also a member of the Detainers Act. *See* 18 U.S.C. App. § 2.").

[24] *Nealy v. Vasquez*, No. 15-0004, 2015 WL 4092877, at *2 (W.D. La. Jul. 6, 2015) (Judgment adopting Report) ("However, it appears that Louisiana has never adopted the IADA, and thus petitioner cannot assert a statutory violation.") (citing *Birdwell v. Skeen*, 983 F.2d 1332, 1335 (5th Cir. 1993) ("In the absence of the IADA, 'a jurisdiction [can] file a detainer on a prisoner and refuse to prosecute its case until the prisoner's release from incarceration in the first jurisdiction.'")); *United States v. Williams*, No.05cr30014, 2008 WL 5532099, at *5 (W.D. La. Dec. 4, 2008),

that the State had means of taking him into custody is conjecture and offers no distinction from *Dickerson* for the court to consider.

### ii.     Assertion 2: Dickerson's Claim of Prejudice

As another alleged distinction, Spratt contends that the *Dickerson* petitioner indicated no prejudice during the three-year delay in the commencement of his prosecution. In contrast, Spratt claims that during his five-year delay between placement of the detainer and his arrest/indictment, two family members died who may have provided an alibi that he was in Mississippi during one of the rapes and an alternative suspect was also lost. These are both contentions thoroughly addressed and rejected in the June Report.[25]

Nevertheless, Spratt's claimed distinction is not accurate. Dickerson *did* argue in his federal proceedings that he was "substantially prejudiced in obtaining alibi witnesses by the pre-indictment delay." *Dickerson v. Louisiana*, No. 89-1357, 1990 WL 179759, at *7 (E.D. La. Nov. 8, 1990). While the details are sparse, the *Dickerson* courts determined that Dickerson failed (like Spratt) to prove actual prejudice. Dickerson nonetheless at least argued or asserted that he was prejudiced by the pre-indictment delay through loss of alibi witnesses.[26] Spratt is incorrect to suggest otherwise.

---

*adopted*, 2009 WL 750273, at 1 (W.D. La. Jan. 20. 2009) ("Louisiana is not a party to the Agreement; therefore, the Agreement's procedures do not apply to the United States in its dealings with Louisiana."); *State v. McCabe*, 420 So.2d 955, 959 (La. 1982) ("Louisiana is not, however, a participant in the Interstate Agreement on Detainers, and the agreement was never signed by Louisiana officials."); *State v. McCarter*, 469 So.2d 277, 285 (La. App. 2d Cir. 1985) (Louisiana did not adopt the Interstate Agreement on Detainers Act, 18 USC App. §§ 1–8).

[25] ECF No. 27, at pages 35-36.

[26] Dickerson asserted that he was unable to call "alibi witnesses," which apparently included his mother. *Dickerson*, 1990 WL 179759, at *7. The court did not identify the alibi witnesses except for Dickerson's mother who testified at trial but did not provide alibi information. *Id*.

### iii.     **Assertion 4: Dickerson's Custody/Speedy Trial Efforts**

Even more disingenuous is Spratt's claim that the petitioner in *Dickerson* made no attempts to challenge the detainer and initiate the proceedings against him.[27]  There is no doubt that Dickerson in fact engaged in lengthy and repeated attempts for several years to gain his transfer to Louisiana.  As discussed above, Dickerson's efforts were outlined in great detail as a "saga" and "labyrinthian journey" in the Fifth Circuit's 1987 opinion denying Dickerson pretrial habeas relief and quoted again in the district court's ruling in 1990 denying his post-trial habeas relief. *Dickerson*, 816 F.2d at 222-23; *Dickerson*, 1990 WL 179759, at *3-5.  To emphasize the *extensive* effort made by Dickerson, his "labyrinthian journey" is repeated here:

> Dickerson first requested a speedy trial on the murder and kidnapping charges in [an] affidavit form on March 12, 1983.  On April 27 Dickerson wrote the state court for information concerning his motion for speedy trial.  The matter was set for hearing on June 15; the hearing was held, but the result is unknown and there is no transcript of the hearing in the record.  On July 20 another hearing on the motion was held, but again there is no result in the record, and again no transcript was made.  It appears, however, that the motions were denied.

> In October 1983 Dickerson wrote further motions requesting a speedy trial; these motions were apparently filed with the state court in late October or early November.  On December 21 *Dickerson was advised by a letter from the clerk of the 21st Judicial District Court that it no longer had any outstanding charges or warrants for his arrest but that the clerk's office had no information regarding any detainers that might have been placed on him.*

> During this time Dickerson was also pursuing other avenues of relief regarding the detainer.  On October 8, 1983, through a request for an administrative remedy from the United States Department of Justice, Dickerson asked that the detainer be removed from his file.  On October 19 the government advised him that Louisiana needed to file for a writ ad prosequendum.  On November 28 Dickerson's request to the government for an administrative remedy was denied; the government responded that two arrest warrants filed by the sheriff's office in Tangipahoa Parish with federal prison officials were outstanding and remained in effect.  Furthermore, since Louisiana was not a member of the Interstate Agreement on Detainers Act (the Detainers Act), 18 U.S.C.App., the government informed Dickerson that he could not request disposition under the Detainers Act.

---

[27] ECF No. 28, at 7.

On December 14 Dickerson filed a request for an appeal of the government's denial of his request for an administrative remedy; that request was denied on December 22.

On January 3, 1984, Judge Fogg of the state district court denied a request to discharge Dickerson from state custody. Dickerson subsequently filed further motions with the district court as well as an application for a writ of mandamus with the state court of appeals. On January 10 the Louisiana First Circuit Court of Appeal denied the writ and other relief. Dickerson then filed another motion for a speedy trial in the state district court.

On January 24, 1984, the government advised Dickerson that it could not force Louisiana to try him, that it had verified with the state court that the arrest warrants were valid and outstanding, and that consequently it would not remove the detainer. On January 30 Dickerson filed another motion for a speedy trial with the state court. On February 15 he filed a notice of appeal from Judge Fogg's ruling of January 3, and on March 16 he filed another motion in state court asking the court to dismiss the charges along with a brief in support of the motion. On May 30 the state appeals court denied Dickerson's request for appeal and for supervisory writs, 450 So.2d 1080 (La.Ct.App.1984).

On July 3, 1984, Dickerson again requested the federal government to remove the detainer. On December 2 Dickerson renewed his request for information from the federal government about the detainers. Eight days later, on December 10, Dickerson was advised that the detainer had been placed by the Tangipahoa Parish Sheriff's Office. He filed another petition for a speedy trial in the state court that same day.

On January 28, 1985, the chief criminal deputy of the sheriff's office wrote the manager of the United States Penitentiary Administration Systems and informed him that he (the deputy) intended to have Dickerson arrested for murder and kidnapping. On January 31 Dickerson filed another petition for a writ of habeas corpus ad prosequendum with the state court. In his petition, Dickerson again asked that he be tried as quickly as possible; alternatively, he asked the court to dismiss the charges against him with prejudice for violation of his sixth amendment right to a speedy trial. At this point, however, *the state had not yet indicted Dickerson on any specific charges*. The state court apparently denied the motion. Dickerson subsequently applied for remedial writs from the Louisiana Supreme Court; although the record does not reflect when this was done, on February 8 the Louisiana Supreme Court denied his application. On May 14 Dickerson filed two more motions for a speedy trial in the state court.

*Dickerson*, 816 F.2d at 222-23 (emphasis added, footnotes omitted).

Clearly, Spratt is mistaken in his suggestion that the petitioner in *Dickerson* made no effort to learn about the detainer and secure his speedy trial. Dickerson's efforts to secure a speedy trial

were even more extensive than those claimed to have been done by Spratt's letter writing and non-specific investigation.

In another similarity, not distinction, as emphasized in the quoted language above, Dickerson, like Spratt, was also told by the offices of the clerk of the state court and prosecutor that there were no outstanding charges or warrants or information on detainers. *Dickerson*, 816 F.2d at 222. Addressing Dickerson's claim, the Fifth Circuit noted:

> The apparent confusion over the status of the detainers was caused by the fact that ***the sheriff's office*** in Tangipahoa Parish ***is not required to and does not file copies of outstanding warrants with either the district attorney or the clerk of the court.*** Consequently, when Dickerson wrote these latter two offices to request information about the detainers, officials had no knowledge about the detainers.

*Dickerson*, 816 F.2d at 222 n.3 (emphasis added). Spratt received a similar response when he attempted to locate information and the source of his detainer and the existence of charges from Orleans Parish court officials. As in *Dickerson*, the lack of information provided or available to Spratt does not demonstrate some intentional deflection or attempt to purposefully delay his trial by the State. Instead, the lack of knowledge and information in offices of the state clerk of court or prosecutor can be explained by mere function of Louisiana procedure, just as in *Dickerson*.

### c.    Summary

As a brief summary of the highlighted comparisons, Dickerson, like Spratt, was convicted and serving a (federal) sentence in another jurisdiction when Louisiana officials issued arrest warrants and placed a detainer with the custodian. In both cases, Louisiana was not a member of the IADA for purposes of gaining custody faster for either Dickerson or Spratt. Dickerson, like Spratt, argued that he suffered prejudice as a result of the delay. In neither case was prejudice established; it was only alleged. Furthermore, Dickerson, even more so than Spratt, went to great

lengths to secure his transfer to and prosecution in Louisiana.  In both cases, the petitioners were located by Louisiana officials in the custody of other officials, and had arrest warrants and detainers issued to secure future custody of the perpetrators for trial.  In neither case were charges actually filed until years after the detainers were placed and after the then-existing prison sentences in other jurisdictions were completed.  For all of the foregoing reasons, Spratt's case is *not* materially distinguishable from *Dickerson*.

### 2.  Comparison to *Dickey v. Florida*, 398 U.S. 30 (1970)

In his objections, Spratt suggests that the Court should disregard *Dickerson* and consider *Dickey* which he believes to be more analogous to his situation.  At the outset, the Court notes that the holdings in *Dickey* were addressed and incorporated into the Supreme Court's later opinions in *Lovasco* and *Marion* referenced in this Supplemental Report and in the June Report.  In *Dickey*, the Court held that "on demand [from the Defendant] a State had a [Sixth Amendment] duty to make a diligent and good-faith effort to secure the presence of the accused from the custodial jurisdiction and afford him a trial."  *Dickey*, 398 U.S. at 37 (brackets in original); *see Smith v. Hooey*, 393 U.S. 374, 383 (1969).  But the rulings in *Dickey* and *Hooey* (also cited by Spratt) were later qualified by the Supreme Court in *Marion*, when the Court ruled, as already quoted, "that it is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment."  *Marion*, 404 U.S. at 320; *Lovasco*, 431 U.S. at 788-89.  The Court made clear in *Marion* as restated in *Lovasco* that the Sixth Amendment does not extend to the "wholly irrelevant" period prior to actual arrest or indictment.  *Id*. at 321; *Lovasco*, 431 U.S. at 788-89.

19

Spratt, nevertheless, contends in his objections that the facts underlying the *Dickey* opinion are "closer in line" with his case than the *Dickerson* case (which relied on *Lovasco* and *Marion*) for the following reasons:[28]

> (1)    "Like the defendant in *Dickerson*, Robert Dickey was serving time in federal prison for armed robbery when, on September 2, 1960, a Florida detainer was lodged against him."[29]
>
> (2)    "Beginning in 1962, Dickey made repeated efforts to order his extradition to Florida to face charges. Despite his efforts, Dickey remained in federal custody until January 1968."[30]
>
> (3)    "Finally, like the defendant in *Dickey*, Petitioner has demonstrated prejudice resulting from the deaths of three (3) potential witnesses including two (2) that would have placed him out of the state during an offense and another who had been a suspect in at least one (1) rape later attributed to Petitioner."[31]

The Court was instructed to consider whether Spratt's case is more analogous to *Dickey* and the legal effect of these similarities.    The Court reiterates that *Dickey* was not the last pronouncement by the Supreme Court on the effect or relevance of pre-arrest, pre-indictment delay and should not be read separately from the matured doctrine in its progeny in *Lovasco* and *Marion*. Nevertheless, for the reasons that follow, *Dickey* is distinguishable and not more analogous to Spratt's case and provides no alternative legal effect.

### a.    Background of the *Dickey* Case

In late June of 1960, Robert Dean Dickey was taken into custody on federal bank robbery charges and detained in the Jackson County Jail in Marianna, Florida.  *Dickey*, 398 U.S. at 31-32.

---

[28] ECF No. 28, at 6.

[29] *Id*. at 7.

[30] *Id*.

[31] *Id*. at 7-8.

At that time, a Gadsden County Sheriff's Deputy noticed a similarity between Dickey's physical appearance and the description given to him by the sole witness/victim to a June 28, 1960, armed robbery in his Florida county.   On July 1, 1960, the Gadsden County deputy showed the witness/victim a picture of Dickey and even took her to the Jackson County Jail, where she identified Dickey as the robber.   That same day, the deputy secured an arrest warrant charging Dickey with the armed robbery.   Under Florida law, the arrest warrant obtained by the deputy tolled the statute of limitations for purposes of timely prosecution.   *Id*. at 32 n.3.

From July 1, 1960, to September 2, 1960, Dickey remained in federal custody, both pretrial and post-trial, in the Jackson County Jail.   *Id*. at 32.   The Gadsden County Sheriff's Office knew where he was located "but made no effort to serve the warrant or gain custody for the purpose of trial."   *Id*.   During that time, Dickey was convicted on the federal charges and on September 2, 1960, was transferred to federal prison in Leavenworth and then on to Alcatraz.   On the same day, the Gadsden County warrant was sent to the Chief United States Marshal in Atlanta, Georgia, and a formal detainer was lodged against Dickey.   *Id*.

In 1962, Dickey filed a petition for "writ of habeas corpus ad prosequendum" in the Gadsden County court for the State Attorney for Gadsden County to show cause why he should not be ordered to either take the steps necessary to obtain Dickey's presence in Florida for trial or withdraw the detainer for failure to provide Dickey with a speedy trial under the Sixth Amendment. *Id*.   On December 1, 1962, the state circuit court denied the petition on several grounds including findings that Dickey's voluntary unavailability for trial in Florida was a natural consequence of his incarceration for the commission of a federal crime, the speedy-trial issue was prematurely

raised before trial, and even if his Sixth Amendment rights were impacted, it was caused by the federal officials having custody of his person. *Id*. at 32-33.

Dickey again filed for relief in the state court on the same grounds on April 1, 1963, and March 28, 1966. *Id*. at 33. The Florida court again denied both pleadings by reference to the December 1, 1962 order. Dickey petitioned the Florida Supreme Court for writ of mandamus to have the state circuit court either secure his return for trial or withdraw the detainer against him. The state circuit court provided the Florida Supreme Court with copies of its prior orders. The Florida Attorney General also filed a memorandum in opposition on grounds that Dickey's unavailability for trial was caused by his voluntary commission of federal criminal acts. After appointing counsel and receiving oral argument, the Florida Supreme Court opined as to the potential merit of Dickey's arguments but denied relief without prejudice because Dickey identified the wrong respondent in his writ. *Id*. at 33-34.

On September 1, 1967, Dickey filed with the state circuit court a motion to have the court order the Gadsden County State Attorney dismiss the detainer and warrant because he had been denied his right to a speedy trial. *Id*. at 34. The State Attorney then filed a petition for a writ of habeas corpus ad prosequendum to secure Dickey's return to Florida for trial. On December 15, 1967, the state circuit court issued the writ, and the State Attorney filed a bill of information charging Dickey with the June 1960 armed robbery. Dickey was eventually returned to Florida on January 23, 1968.

On January 30, 1968, the day before the trial was to begin, Dickey's appointed counsel filed a motion for a continuance so that the whereabouts of two witnesses could be determined, and a motion asking that the bill of information be quashed on the ground that the delay of over

seven years amounted to a denial of Dickey's right to a speedy trial. *Id*. at 34-35. The motion to quash stated he could not locate one alibi witness who, in lieu of Dickey's sister who died in 1964, would have provided alibi testimony for the time of the armed robbery. *Id*. at 35 n.5. The motion also was accompanied by an affidavit to that effect from Dickey. *Id*. The Circuit Court granted the continuance but took the motion to quash under advisement.

On February 12, 1968, the day before trial, Dickey's counsel filed another motion for a continuance because he was still unable to locate the alibi witness. The court denied the motion and, prior to trial the next day, denied the motion to quash. *Id.* at 35.

Without discussion or explanation, the Supreme Court held that Dickey "was available to the State at all times during the seven-year period before his trial." *Id*. at 36. The Court found that the State had failed to present a "tenable reason" for delaying the trial after Dickey's "diligent and repeated efforts by motions in the state court in 1962, 1963, and 1966 to secure a prompt trial." *Id*. The Court noted that "[i]n the interval two witnesses died and another potential defense witness is alleged to have become unavailable. Police records of possible relevance have been lost or destroyed." *Id*. The Court held that when the accused has been called to face criminal charges, "the duty of the charging authority is to provide a prompt trial," especially when "the accused presses for an early confrontation with his accusers and with the State." *Id*. at 37-38.

**b.     <u>Relevant Similarities and Distinctions</u>**

As an apparent similarity between the *Dickey* case and Spratt's claims (still unsupported by anything but self-serving conjecture), Dickey was found to have shown prejudice as a result of his speedy trial delay through the loss of access to purported alibi witnesses and police documents. However, as discussed further in connection with Spratt's third "similarity" contention *infra*,

unlike Spratt, Dickey presented pretrial support for his lost alibi witnesses. Spratt did not, nor was there lost police evidence in Spratt's case during the delay.

Also, unlike Spratt and the petitioner in *Dickerson*, the issues in *Dickey* were addressed on writ of certiorari following Dickey's direct appeal not on collateral federal habeas review. In addition, Dickey, unlike Dickerson and Spratt, was a *pretrial* federal detainee facing bank robbery charges when he was identified in connection with the Florida armed robbery charge. Also, unlike Dickerson and Spratt, Dickey was still being held in a Florida county jail when the Gadsden officials obtained an arrest warrant. Despite their knowledge, the Gadsden officials did nothing with the warrant and also did not place a detainer on Dickey until after Dickey was convicted on the federal charges and transferred to a federal facility in another State. Dickerson and Spratt were already convicted prisoners serving sentences outside of Louisiana when they each were developed as suspects and had detainers immediately placed against them.

Significantly, the *Dickey* Court also noted that the Gadsden County arrest warrant obtained while Dickey was a pretrial detainee actually interrupted the Florida prosecutor's limitations period , thus triggering speedy trial considerations. As the Court resolved, any delay after that inured to the State's benefit.

The same is not true for Spratt (or Dickerson) where his potential charges (with life-sentence exposure) had no limitations period[32] under Louisiana law. The detainer did not provide any special benefit to the State other than to put Tennessee officials on notice not to release him

---

[32] *See State v. Bilbo*, 719 So.2d 1134, 1137 (La. App. 1st Cir. 1998) (discussing no limitations period for aggravated kidnapping and other offenses with a mandatory life sentence (which would include aggravated rape)); *State v. Smith*, 809 So.2d 556, 563 (La. App. 1st Cir. 2002) (there is no time limitation on the institution of prosecution for any crime for which the punishment may be life imprisonment or for the crime of rape).

upon completion of his Tennessee sentences.  That is, per *Lovasco*, the detainer was not actual restraint to trigger his speedy trial rights.

Another critical difference between *Dickey* and Spratt's situation is that Dickey (like Dickerson) actually filed repeated motions and sought orders to compel Florida officials to begin his trial, for which he already had been held to answer by interruption of the limitations period. Spratt, on the other hand, did not file motions or seek writs to be brought to trial.  In his pleadings, as discussed in detail in the June Report, he and others on his behalf allegedly made inquiries (with very little detail provided in the record) about the possibility of pending charges and the source of the detainer.

Noting these comparisons, the Court will further address each of Spratt's assertions of similarity between his case and that in *Dickey*.

### i.    <u>Assertions 1: Location of Dickey in the Same State</u>

Spratt claims that "[l]ike the defendant in *Dickerson*, Robert Dickey was serving time in federal prison for armed robbery when, on September 2, 1960, a Florida detainer was lodged against him."[33]  As outlined above, this is only a partially correct reading of *Dickey*.  Dickey was a federal *pretrial* detainee when the Gadsden County deputy brought the witness to the jail to identify him as the armed robber.  That same day, the deputy caused an arrest warrant to be issued for Dickey and did not present it anywhere or to anyone.  As noted by the *Dickey* Court, it was the arrest warrant, not the later filed detainer, that acted under Florida law to interrupt the statute of limitations on Dickey's prospective charges.  This, and not the later filed detainer, apparently was the critical point for Dickey's speedy trial clock.  In addition, Dickey was still in Florida when

---

[33] *Id*. at 7.

Gadsden officials obtained the arrest warrant. Spratt and Dickerson were already convicted and in other jurisdictions when Louisiana officials confirmed them as suspects and lodged detainers.

### ii.    **Assertion 2: Dickey's Transfer Efforts**

Spratt next points to Dickey's repeated efforts to gain his transfer to Florida to face trial.[34] There is no doubt that, unlike Spratt, Dickey (and Dickerson) actually filed motions and sought other court remedies to compel state officials to bring him to trial. Spratt did not engage in these more aggressive efforts. He instead claims to have made inquiries (again, with little detail provided in the record) about the possibility of pending charges against him and the source of the detainer, of which he already had a copy. Dickey's extensive efforts were found adequate to put the prosecutor on notice of his duty to bring Dickey to trial.

### iii.    **Assertion 3: Prejudice from Delay**

As a third comparison, Spratt points to Dickey's demonstrated prejudice resulting from the trial delay. Spratt, like Dickey, claims prejudice resulting from the deaths of alleged alibi witnesses.[35] As indicated above, before trial, Dickey's counsel asserted in at least two motions, with a supporting affidavit, that Dickey's sister died while he was in federal custody and would have testified as to his whereabouts during the armed robbery and that a second witness who would similarly testify could not be located. Dickey's arrest and charges were based solely on the identification made by the armed robbery victim with no other direct, tangible evidence linking him to the crime. The loss of potential alibi witnesses, identified before trial, was significant. In

---

[34] ECF No. 28, at 7.

[35] *Id*. at 7-8.

*Dickey*, the pivotal evidence was the identification of the sole eyewitness/victim, something that was reasonably susceptible to challenge by the alibi testimony Dickey lost.

As addressed in the June Report and Recommendation, Spratt alleged in his post-conviction pleadings, well after trial, that his father and grandmother died before they could testify about his alleged trip to Mississippi during the time of one of the three aggravated rapes. However, Spratt was located and charged because of DNA and other evidence which established that he was present at the three rapes. This direct, tangible evidence was starkly different from the lone witness identification in *Dickey*.

Spratt also contends that he was prejudiced by his inability to present an alternative suspect, Officer Daniels, who also died before his trial. Nevertheless, as already explained, Daniels had been eliminated as a suspect years before his death and year's before Spratt's trial through police investigation and DNA evidence.

Even if the detainer was not "wholly irrelevant" to Spratt's speedy trial rights, his unsupported claims of pre-indictment prejudice fall far short of the supported showing of actual prejudice found in *Dickey*.

### iv.    <u>Summary</u>

Spratt has not established relevant or significant similarities between his case and the facts considered in *Dickey* and none that would provide alternate legal effect to the findings and conclusions addressed in the Court's June Report and Recommendation. The distinctions in the cases and circumstance are more compelling, including: Dickey's pretrial location and identification by state officials; the arrest warrant under Florida law interrupted the prosecution's statute of limitations years before the detainer was placed; and Dickey's extensive efforts to assert

his speedy trial rights by motion and other means through the state courts. Most compelling for legal effect is the fact that after *Dickey*, the Supreme Court clarified its doctrine in *Marion* and *Lovasco* to clearly hold that a detainer, like that in Spratt's case, was not enough to trigger speedy trial and that a petitioner, like Spratt, would have to await an indictment, arrest, or be otherwise officially accused or held to answer charges in order to trigger speedy trial rights. This did not occur in Spratt's case.

### 3.    Additional Legal Considerations

#### i.    *Strickland*'s Deficient Performance Prong

In addition to the analysis in the June Report, the Court finds further support for denial of Spratt's *Strickland* claim and cause exception related to his counsel's failure to assert a pretrial motion to quash based on the preindictment delay. Focusing first on the deficiency prong, the Court reiterates each of the reasons given in the June Report for the conclusion that counsel was not deficient and the state courts' denial of relief was not contrary to *Strickland*. As determined in that report, Spratt's counsel did not act unreasonably in failing to file a motion where there was no compelling legal precedent or circumstances to support such a motion in Spratt's case. *See Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002) (counsel is not required to make futile motions or frivolous objections); *Smith v. Puckett*, 907 F.2d 581, 585 n.6 (5th Cir. 1990) ("Counsel is not deficient for, and prejudice does not issue from, failure to raise a legally meritless claim."); *see also Wood v. Quarterman*, 503 F.3d 408, 413 (5th Cir. 2007) ("'[f]ailure to raise meritless objections is not ineffective lawyering; it is the very opposite.'") (citation omitted).

In addition, the preindictment delay constitutes a violation only when the petitioner can show that: (1) he incurred substantial prejudice as a result of the delay; and (2) the prosecution

*intentionally* employed the delay to gain a tactical advantage.  *See Marion*, 404 U.S. at 325.  As already discussed, Spratt has not established substantial prejudice (only speculative) caused by the delay.  In light of the extensive evidence against him, including the DNA evidence which directly contradicts his post-conviction alibi claim, he cannot demonstrate the type of prejudice necessary.  As the Fifth Circuit has held "speculative allegations, such as general allegations of loss of witnesses and failure of memories are insufficient to establish the requisite actual prejudice." *United States v. Avalos*, 541 F.2d 1100, 1008 (5th Cir. 1976).  Spratt also has not alleged or shown that the delay between the 2005 detainer and his 2010 arrest and indictment, or later trial, was an intentional or tactical move by the prosecutor to gain an advantage at trial, as it was found to be in *Dickey*.  *See Id*.  As has been discussed, unlike in *Dickey*, Louisiana officials had no ability to precure Spratt's presence to answer to the charges while he was serving a sentence in Tennessee. There is no evidence or showing that the detainer was placed as a tactical advantage for the prosecutor like it was in *Dickey*.

The Court also reiterates that its thorough discussion of the legal groundwork for a proper preindictment speedy trial claim is presented ***only*** to determine the reasonableness of Spratt's counsel's actions under the first prong of *Strickland*.  Spratt's stand-alone claim of a speedy trial violation is in *procedural default* and cannot be considered by the Court unless he proves counsel as cause for his default through his proffered ineffective assistance of counsel claim.  The foregoing discussion, along with that in the Court's prior Report, provides further support for the conclusion that it was not unreasonable or deficient for Spratt's counsel to have pressed forward without a motion to quash that would have had no clear legal support or likelihood of success. *See*

*Johnson*, 306 F.3d at 255; *Smith*, 907 F.2d at 585 n.6.  Therefore, it was not contrary to or an unreasonable application of federal law for the state courts to deny his *Strickland* claim.

Nevertheless, even if a reviewing court determines that Spratt's counsel should have filed the motion to quash (or urged the claim on appeal) despite the holdings in *Lovasco* and *Marion*, the *Strickland* standard would also require that Spratt prove prejudice as a result of counsel's deficient performance, which he has not done.

### ii.    *Strickland*'s Prejudice Prong

As outlined in the June Report, to prove prejudice under *Strickland*, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694; *Williams v. Thaler*, 602 F.3d 291, 310 (5th Cir. 2010).  Furthermore, "[t]he petitioner must 'affirmatively prove,' and not just allege, prejudice."  *Day*, 566 F.3d at 536 (quoting *Strickland*, 466 U.S. at 695).  In this context, "a reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Cullen*, 563 U.S. at 189 (quoting *Strickland*, 466 U.S. at. 694).  This standard requires a "substantial," not just "conceivable," likelihood of a different result to the proceeding. *Harrington*, 562 U.S. at 112.

Spratt cannot prove prejudice as a result of counsel's failure to file a motion to quash based on speedy trial grounds because he cannot show that the result of the proceedings would have been different.  Given the strength of the evidence against Spratt, a motion to quash the indictment, if granted by the state courts, would have simply delayed the inevitable filing of another bill or indictment.  *See Merridith v. Cain*, No. 04-1227, 2006 WL 2054446, at *7 (W.D. La. Jun. 29, 2006), *adopted*, 2006 WL 6358372 (W.D. La. Jul. 21, 2006).  That is to say, even if his trial counsel

had successfully moved to quash, Spratt would have been re-indicted; and there is no showing that the result trial would have been any different. *See Pickney v. Cain*, 337 F.3d 542, 545 (5th Cir. 2003) ("[W]e have no doubt that, if [petitioner] had been successful in having his indictment quashed, the State of Louisiana would have sought and obtained a second indictment"); *Brown v. Cain*, 337 F.3d 546, 550 n.5 (5th Cir. 2003) (same); *Pea v. Cain*, No. 14-0083, 2017 WL 1197872, at *13 (M.D. La. Feb. 28, 2017), *adopted*, 2017 WL 1199740 (M.D. La. Mar. 30, 2017).

Accordingly, the state courts' denial of relief on Spratt's ineffective assistance claim was not contrary to or an unreasonable application of *Strickland* where Spratt did not establish deficient performance or requisite prejudice. His meritless claim of ineffective assistance also cannot excuse the procedural default of his separate speedy trial claim. *See Romero v. Collins*, 961 F.2d 1181, 1183 (5th Cir. 1992). As mentioned in the June Report, "[a]bsent a showing of cause, it is not necessary for the court to consider whether there is actual prejudice" resulting from the default of his speedy trial claim. *Martin v. Maxey*, 98 F.3d 844, 849 (5th Cir. 1996).

For all of the foregoing reasons, Spratt's objections should be overruled and his habeas claims denied and dismissed with prejudice.

## III.   Spratt's Objections to the Remaining *Strickland* Claims

The Court also was referred the merits of Spratt's other objections. In the June Report and Recommendation (ECF No. 27), the Court considered Spratt's other claims of ineffective assistance regarding the failure to object to the jury charges and the expert testimony regarding the DNA evidence, and found that he failed to show that the state courts' denial of relief was contrary to or an unreasonable application of federal law under the AEDPA deferential standards.

### A.    Counsel's Failure to Object to the Jury Instructions

In his objections, Spratt asserts objections "[o]n the issue of the trial court's erroneous jury instructions . . ."[36]  To be clear, there is **no** separate issue before this federal habeas court on "the trial court's erroneous jury instructions."  The issue before this Court is whether Spratt's trial counsel was ineffective for failing to challenge the trial court's jury instruction.  Discussion regarding the validity of the jury instruction was part of the Court's examination of the reasonableness of counsel's actions to determine whether the state courts' denial of relief was appropriate under *Strickland* and the AEDPA standards of review.

Assuming Spratt is objecting to the Court's *Strickland* discussion, he argues, as he did in his petition, that his counsel should have objected because the inclusion of a forcible rape definition in the jury instructions on aggravated rape "invited the jury to convict without finding Petitioner guilty of vaginal or anal penetration as required by the charging statute at issue" and lessened the State's burden of proof.  ECF No. 28, at 9.  Spratt's objections, however, ignore the Court's initial finding that he wholly failed to provide any support for his claim that an erroneous jury charge was actually given to the jury for his counsel to have urged an objection for purposes of a *Strickland* claim:

> As an initial matter, Spratt has failed to provide any objective support for his claim that an erroneous charge was read by the state trial court.  He has not provided a transcript to establish the error to which he claims counsel should have objected.  It is well settled that a habeas petitioner cannot establish a *Strickland* claim based on speculative and factually unsupported assertions.  *Ochoa v. Davis*, 750 F. App'x 365, 371 (5th Cir. 2018) (quoting *Sawyer v. Butler*, 848 F.2d 582, 589 (5th Cir. 1988) ("Indeed, '[u]nsupported allegations and pleas for presumptive prejudice are not the stuff that Strickland is made of.'"); *Ross* [ *v. Estelle*], 694 F.2d [1008 (5th Cir. 1983)] (a court cannot consider a habeas petitioner's bald assertions on a critical issue absent evidence in the record or that are unsupported and

---

[36] ECF No. 28, at 9.

> unsupportable by anything in the record); *see Green v. Johnson*, 160 F.3d 1029,
> 1042 (5th Cir. 1998) ("Mere conclusory allegations in support of a claim of
> ineffective assistance of counsel are insufficient to raise a constitutional issue.")
> (citation omitted).  Spratt's claim therefore fails to meet any threshold burden under
> *Strickland* and fails to prove that the denial of relief was contrary to or an
> unreasonable application of *Strickland*.

ECF No. 27, at 38.  Without proof that an erroneous jury charge was even used at trial, Spratt

cannot establish that his counsel was unreasonable in failing to object to the charges.

Nevertheless, to provide a thorough review, the Court looked past Spratt's failure, and

assuming for purposes of argument that an incorrect instruction was given, addressed his claim

under *Strickland* to determine that the state courts' denial of relief was reasonable.  Citing Supreme

Court law, the Court considered the necessary question of "whether there is a reasonable likelihood

that the jury has applied the challenged instruction in a way that violates the Constitution." *Estelle*

*v. McGuire*, 502 U.S. 62, 72 (1991) (citation omitted); *Flowers v. Blackburn*, 779 F.2d 1115 (5th

Cir. 1986).  In his objections, Spratt takes exception to the Court's finding that he failed to establish

that the jury was confused by the alleged instruction.  Spratt would have to establish this confusion

as a requisite to proving deficient performance and prejudice under *Strickland* to challenge the

reasonableness of the state courts' denial of relief.

While manipulating the language quoted from the June Report (*see* ECF No. 28, at 9),

Spratt omits the Court's statements regarding why there was no likelihood that the jury misapplied

the alleged instruction:

> Considering the trial record, there was no prejudice or likely impact on the jury's
> verdict because there was **no evidence or testimony of oral sex** during the course
> of any of the kidnappings or rapes.  Each victim testified about the non-consensual
> vaginal sexual intercourse they endured and no other type.

ECF. No. 27, at 40 (emphasis added). The jury could not have misapplied the instructions if there was no evidence of oral sex to even consider as an element of proof (assuming forcible rape or oral sex were included in the instructions). It is Spratt's burden to prove the reasonable likelihood of misapplication beyond his unsupported argument. However, Spratt did not provide any proof that an incorrect charge was read, much less that the jury misunderstood or misapplied the charges given. There was no basis for his counsel to have objected to the jury instructions.

As the Court has already urged, the state courts' denial of relief on this claim was not contrary to or an unreasonable application of *Strickland*. Spratt's objections should be overruled and his claims denied and dismissed with prejudice.

### B.    Counsel's Failure to Object to the DNA Expert Testimony

Spratt also includes an objection stated as follows: "Finally, the Magistrate found no merit to Petitioner's hearsay/Confrontation Clause claim, finding that the Supreme Court's ruling in *Bullcoming v. New Mexico*, 131 S. Ct. 2705, 180 L. Ed. 2d 610; 2011 (2011) was largely inapplicable." ECF No. 28, at 10. To again be very clear, there is ***no*** separate claim under the Confrontation Clause urged before this Court and none was considered or addressed.

The discussion of the DNA expert testimony in the June Report and Recommendation was engaged for the purpose of determining the reasonableness of Spratt's counsel's effective assistance under *Strickland* for the Court to evaluate the reasonableness of the state courts' denial of relief under the deferential AEDPA standards. In his objections, Spratt repeats his earlier arguments that the testimony of the DNA experts violated *Bullcoming* as surrogate testimony, arguments already addressed and rejected by the state courts and this Court in determining that he failed to prove ineffective assistance of counsel.

34

Without repeating all that was discussed in the June Report, Spratt's rhetoric and non-specific arguments leaves unclear exactly what aspects of the experts' testimony he is challenging and what exactly he believes the experts did not test or analyze themselves.[37]  As detailed in the June Report, Anne Montgomery testified with regard to her testing and calculated results from M.L.'s rape kit, which included the vaginal swab and blood sample.  She testified that, after the analyst Karen Holmes generated an initial report on the DNA, she looked anew at the raw data and formed her own opinions independent of those from Holmes.[38]  Both Holmes and Montgomery signed the joint report introduced at Spratt's trial.[39]

Similarly, Gina Pineda testified that she was one of two analysts who independently reviewed the data from the rape kits for D.K. and S.M.  Pineda explained that the DNA raw data is generated by a machine, but she conducted her own analysis and drew her "own independent conclusions from the data that are listed in the report."[40]

In the June Report and Recommendation, the Court provided clear distinction between the types of testimony found improper in *Bullcoming* and *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310-11 (2009), and addressed the marked difference between that in Spratt's case.  Spratt's dismissal of the Supreme Court's later holding in *Williams v. Illinois*, 567 U.S. 50, 66 (2012), referenced in the June Report, is not compelling.  Spratt merely disagrees with the Supreme Court's conclusion that experts like Montgomery and Pineda are not prohibited from testifying about DNA

---

[37] The Court is not obliged to broadly construe counsel-filed pleadings but for the benefit of petitioner has done as necessary here and in the prior Report for purposes of discussion and to sift through the bumptious comments and rhetoric included in the counsel-filed pleadings.

[38] St. Rec. Vol 10 of 12, Trial Transcript, at 93, 106, 111, 3/7/12.

[39] *Id*. at 111.

[40] *Id*. at 179.

evidence when they have first-hand knowledge of the facts, comparisons, and conclusions in their reports. *Williams* is not a "sidestep" by the Court but in fact it is Supreme Court law applicable to resolution of his claim because it supports the resolve that his counsel had no legal basis (and was not deficient when he failed) to object to the experts' testimony.

There was nothing surrogate about anything in the testimony by Montgomery or Pineda, who each testified in great detail with regard to the testing of the rape kits, the compilation of data by the computer processes and human analysis, including the comparison and analysis they respectively conducted on the raw data before them. There were no blanket certificates as in *Melendez-Diaz* and no disinterested scientist opining about someone else's intoxication report like in *Bullcoming*. Both Montgomery and Pineda were in fact the analysts who prepared and certified the reports and results in their respective reports. They did in fact testify about what they personally reviewed, analyzed, and observed, the testing processes, and the "rigors and protocols of the DNA testing"[41] in which they each were involved. Contrary to Spratt's contentions, they each testified that they had no interest in the outcome of the testing they conducted nor knowledge of the individuals involved. Both Montgomery and Pineda had "a personal connection to the scientific testing and actively reviewed the results of the forensic analyst's testing and signed off on the report," which included their own input and analysis. *Williams v. Vannoy*, 669 F. App'x 207, 208 (5th Cir. 2016) (*per curiam*) (citing *Bullcoming*, 564 U.S. at 652); *Grim v. Fisher*, 816 F.3d 296, 310-11 (5th Cir. 2016) (some involvement is sufficient because the Supreme Court has not explained the degree of involvement that a testifying witness must have under *Bullcoming*).

---

[41] ECF No. 28, at 11.

Having failed to establish that his trial counsel had grounds to object to the DNA experts' testimony, Spratt has not established that his trial counsel was ineffective or that the state courts' denial of relief was contrary to Supreme Court law. Spratt's objections should be overruled and his claims denied and dismissed with prejudice.

## IV.    <u>Recommendation</u>

For the foregoing reasons, it is **RECOMMENDED** that Jimmie Spratt's objections be **OVERRULED** and for the reasons assigned in the June 16, 2020, Report and Recommendation (ECF No. 27) and this Supplemental Report and Recommendation, Spratt's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within fourteen (14) days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Servs. Auto. Assoc.*, 79 F.3d 1415, 1430 (5th Cir. 1996).[42]

New Orleans, Louisiana, this ___4th___ day of June, 2021.

_____

**KAREN WELLS ROBY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

---

[42]*Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.